IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 4, 2021 Session

**CALVIN BANKS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**Nos. 14-03645, 14-03840  Carolyn W. Blackett, Judge**

―――――――――――――――――――

**No. W2020-01164-CCA-R3-PC**

―――――――――――――――――――

Petitioner, Calvin Banks, was convicted by a Shelby County jury of first degree premeditated murder and being a convicted felon in possession of a weapon. The trial court imposed an effective life sentence. Petitioner's convictions were affirmed on direct appeal. Petitioner sought post-conviction relief, claiming that he received ineffective assistance of counsel at trial. Following an evidentiary hearing, the post-conviction court denied relief. Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Calvin Banks.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Trial*

This case arose from a dispute between acquaintances that resulted in the shooting death of the victim, Terrence Davis. *State v. Calvin Banks*, No. W2016-01085-CCA-R3-CD, 2017 WL 3535017, at *1 (Tenn. Crim. App. Aug. 17, 2017), *perm. app. denied* (Tenn. Dec. 8. 2017). The victim's body was found around 7:00 a.m. on March 6, 2014, on Cedar Street in Memphis. *Id*. Earlier that morning, at around 2:45 a.m., Petitioner arrived at

Methodist North Hospital with his girlfriend Lavinceia Allen. *Id*. Petitioner had a gunshot wound to his ankle. Petitioner initially told police that he was involved in a "drug deal . . . that went bad." *Id*. Ms. Allen told police a story that was inconsistent with Petitioner's account, and when confronted, Petitioner admitted that he shot himself in the foot with his own gun. *Id*. Ms. Allen gave police consent to search her vehicle, and police found a gun in the trunk of Ms. Allen's car. *Id*. A forensic analysis of the bullet fragments from the victim's body and a spent bullet recovered from the crime scene revealed that they were fired from the gun that was recovered from Ms. Allen's vehicle. *Id*. at *2.

Raphael Farmer, a neighborhood acquaintance of Petitioner, testified that while he and Petitioner were incarcerated together in 2014, Petitioner told him that he shot the victim. *Id*. Petitioner told Mr. Farmer that he was angry at the victim because the victim had told him about a robbery target, and Petitioner did not find what the victim told him he would find in the robbery. *Id*. Petitioner told Mr. Farmer he "didn't get nothing" from the robbery. *Id*. Mr. Farmer testified that Petitioner was so angry that he got out of the car on Cedar Street, shot the victim in the head, and said, "F**k the n***er. He a junkie anyway." *Id*. Petitioner said that he left the victim on the street and drove away. *Id*. Petitioner told Mr. Farmer that "a bitch" and "Ali" were with him when he shot the victim. *Id*. He also told Mr. Farmer that he shot himself in the foot and that the police had recovered the gun from the car at the hospital. *Id*.

On the day of Petitioner's trial, Ms. Allen disclosed to the prosecutor for the first time that she witnessed the murder. *Id*. at 3. After being granted immunity for any false statements that she had given to police, Ms. Allen testified that she had been living with a "secret" for the past two years. *Id*. She testified that on the day of the murder, Petitioner borrowed her car and was gone for most of the day. *Id*. When Petitioner picked her up that night, "Ali," "Little Yo," and the victim were in the car. *Id*. Petitioner was upset because "the mission" had not gone well. *Id*. Ms. Allen testified that Petitioner was angry at the victim, and the men in the car were bickering. *Id*. She testified that Petitioner drove to a street in North Memphis, stopped the car, and ordered everyone except Ms. Allen to get out of the car. *Id*. Ms. Allen saw Petitioner's "gun go up." *Id*. She closed her eyes and heard gunfire, but she did not recall how many shots she heard. *Id*. Petitioner, Ali, and Little Yo got back in the car without the victim. *Id*.

Ms. Allen testified that they drove away and dropped off Ali and Little Yo at "the house." *Id*. Petitioner then drove Ms. Allen back to her apartment. *Id*. As he was attempting to park the car, Petitioner "reached down and was doing something and the gun went off." *Id*. Ms. Allen testified that she was terrified based on the events of the evening. *Id*. She drove Petitioner to the hospital, and he passed out on the way there. *Id*. The police talked to Ms. Allen at the hospital. *Id*. She initially told police that she and Petitioner had been robbed, which was Petitioner's "story." *Id*. Police eventually searched Ms. Allen's

car and found Petitioner's gun in the trunk. *Id.* Ms. Allen admitted that she "threw" the gun in the trunk in a panic after Petitioner shot himself. *Id.* Following his release from the hospital, Petitioner called Ms. Allen from jail and told her he was "mad" at her for letting "them get his baby," which Ms. Allen believed was a reference to his gun. *Id.* Ms. Allen acknowledged that she had never told anyone about having witnessed the murder and that she lied to police. *Id.* She testified that she did so to protect herself and her child. *Id.*

The parties stipulated that Petitioner was a convicted felon at the time of the offense. Based on the evidence presented at trial, the jury convicted Petitioner of first degree premeditated murder and being a convicted felon in possession of a firearm, and the trial court sentenced him to an effective life sentence. On direct appeal, Petitioner challenged the sufficiency of the evidence to support his murder conviction, and a panel of this Court affirmed the conviction. *Id.* Petitioner then filed a timely pro se petition for post-conviction relief and an amended petition through appointed counsel. Following a hearing, the post-conviction court denied relief, and Petitioner appeals.

### *Post-conviction hearing*

At the hearing on Petitioner's petition for post-conviction relief, trial counsel testified that he was appointed to represent Petitioner in August, 2014. He testified that he was licensed to practice law in 2000 and that he represented clients mostly in criminal cases and personal injury cases. Trial counsel estimated that he had tried between 50 and 75 cases before a jury.

Trial counsel met with Petitioner at the jail "a bunch of times." He testified that his investigator called the jail "several times" and set up visits between Petitioner and trial counsel and his investigator. Trial counsel explained that he "always wanted to have somebody else around when [he] met with [Petitioner] just in case, you know, because he seemed pretty volatile at times." Trial counsel testified that he reviewed discovery materials with Petitioner. Trial counsel never considered filing a motion to bifurcate the trial on the charges of first degree murder and being a convicted felon in possession of a weapon. He testified, "I just don't remember that being one of the core issues that I was looking at. I thought there were more serious issues related to [Petitioner]'s case. So that wasn't one of them." Trial counsel did not research this issue. He testified that it "wasn't something that popped up in [his] mind that would have made [him] think okay, this is going to be a game changer." Trial counsel also testified that he did not consider objecting to the trial court's instruction to the jury that before finding Petitioner guilty of being a felon in possession of a firearm, the jury had to find that Petitioner's prior felony involved the use or attempted use of a deadly weapon. Trial counsel testified, "just for the sake of the exercise, I probably should have objected to it[,] but I didn't at the time."

Trial counsel testified that he filed a pretrial motion for a *Morgan* hearing.[1]  He stated that it was part of his standard motions practice, but that a hearing was never held on the motion.  Counsel testified, "I knew that his prior felony conviction was going to come in so, you know, I guess I could have gone through the exercise, right, but I didn't." Trial counsel understood that Petitioner had a prior conviction for criminally negligent homicide.  He testified that "it was a judgment call" whether the trial court would have allowed evidence of the prior conviction if Petitioner testified at trial.  Trial counsel testified, "frankly, I would never have felt comfortable putting [Petitioner] on the stand because I felt like he would have perjured himself."  He testified that Petitioner "never gave [him] a straight story.  He gave [him] multiple stories."  Trial counsel advised Petitioner of the "pros and cons" of testifying at trial and the strength of the State's evidence against him, and Petitioner told trial counsel that he did not want to testify.  Trial counsel testified that Petitioner's prior conviction was "the least of [his] concerns" regarding Petitioner's decision whether to testify at trial.

Trial counsel did not consider hiring an independent ballistics expert.  He testified, "maybe I would have gone down that road," but, "[I] never could really get a straight story" from Petitioner.  Trial counsel did not argue a *Miranda* violation in a motion to suppress Petitioner's statements to police at the hospital because he "could never really get the real story from [Petitioner], which made it very difficult for [trial counsel] to do [his] job effectively pretrial."  He also testified that at the time police talked to Petitioner at the hospital, the murder had not yet been reported, and Petitioner was not a suspect.

Trial counsel testified that he "didn't really see the whole point of filing a motion to keep [Petitioner]'s nickname out."  Trial counsel was aware that Petitioner's nickname was "Chief," but counsel did not believe the nickname indicated Petitioner was engaged in criminal activity, and counsel did not believe evidence of the nickname would "impact his innocence or guilt."

Trial counsel testified that, before Ms. Allen testified at Petitioner's trial, the State extended a plea offer with an 18-year sentence.  Trial counsel thought it was "an excellent offer based on what [Petitioner] was looking at, which was life in prison."  Trial counsel recalled that the trial judge "gave [him] several hours to discuss [the plea offer] with [Petitioner]."  Trial counsel testified that the prosecutor, Paul Hagerman, told him that he "was making that offer based on [trial counsel's] great cross-examination of [the State's]

---

[1] In *State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976), our supreme court adopted Rule 609 of the Federal Rules of Evidence concerning the impeachment of a witness by evidence of a prior criminal conviction.  The rule provides that a witness may be impeached by evidence of a conviction for any crime involving dishonesty or false statement, regardless of the punishment, or by evidence of a conviction for a crime punishable by imprisonment in excess of one year if the court determines in a jury-out hearing that the probative value of the conviction outweighs its prejudicial effect.  *Morgan*, 541 S.W.2d at 388-389.

witnesses." Trial counsel "played the jail tapes for [Petitioner] in the back and told him that [the tapes] would be played [for the jury]." Trial counsel encouraged Petitioner to accept the offer, but Petitioner told trial counsel, "I'd be too old when I got out of prison."

After Petitioner rejected the State's plea offer, Mr. Hagerman told trial counsel that the State had entered into an immunity agreement with Ms. Allen and told him the substance of her testimony. Trial counsel did not request a mistrial or a continuance when he learned that the State was going to call Ms. Allen as a witness because "it would just be prolonging the inevitable." Trial counsel believed that "the trial had gone probably as well as it could have gone as it related to the other witnesses and [he] did not want . . . to lose the momentum . . . of what [he] had done on the cross[-examination] with the other witnesses and give the State an opportunity to start over and clean that up." Counsel further explained that Ms. Allen had already given "multiple statements," and he attempted to attack her credibility based on inconsistencies in her statements. Trial counsel did not recall Ms. Allen testifying that she had received threats prior to testifying. Trial counsel said, "I probably was caught off guard by it, but if she did make that comment[,] I should have objected to it."

Trial counsel testified that he inquired about the identity of a Crime Stopper tipster but was told by the police that they were unable "to get that information." Trial counsel testified that he made a strategic decision not to object to the prosecutor's closing argument because it can have a negative impact on a client and draw more attention to the objectionable comment.

Emergency room physician Dr. David McMillan treated Petitioner around 3:00 a.m. on March 6, 2014, at Methodist North Hospital. Petitioner had "an in-and-out gunshot wound to the left heel and ankle." Dr. McMillan testified that Petitioner "was moaning in pain." Petitioner was able to communicate with him, and Petitioner told him that he was the victim of a robbery and that he had been shot when he turned to run from the robber. Dr. McMillan noticed "an odor of alcohol to [Petitioner]." A blood test showed that Petitioner's blood alcohol content was 0.133. He described Petitioner as "awake and . . . alert. He was fairly well oriented. He responded appropriately" to all of Dr. McMillan's questions. Dr. McMillan testified that Petitioner "didn't seem to be combative or disoriented at all." According to the Glasgow Coma Scale, Petitioner had "normal mental status," and he scored four out of four for eye response, five out of five for verbal response, and six out of six for motor response. Dr. McMillan testified that Petitioner "was able to understand [his] questions" and gave "coherent response[s]."

Memphis Police Officer Will Bryson responded to a "shooting call" from the hospital at around 3:08 a.m. on March 6, 2014. When he arrived, he spoke to Ms. Allen, and she told him that she and Petitioner had been robbed at Ridgecrest Apartments. He

then spoke to Petitioner, who stated that they had been robbed at Briarcrest Apartments during a drug deal. Officer Bryson testified that he did not give Petitioner *Miranda* warnings, explaining, "that's our policy. We just asked general questions. We're not doing any kind of interrogations. We just want to know the basic information of what happened." Officer Bryson suspected that Petitioner's gunshot wound was self-inflicted, so he confronted Petitioner. He told Petitioner, "go ahead and tell us the truth because most of the time if you shoot yourself[,] you don't get in any kind of trouble. You just made a dumb mistake." Petitioner then admitted that he had shot himself in the foot. Officer Bryson asked Petitioner where the gun was, and Petitioner told him it was inside Ms. Allen's vehicle. Ms. Allen gave consent for officers to search her vehicle. Officer Bryson testified that he did not suspect Petitioner may have committed a crime, and Petitioner "was always a victim" during Officer Bryson's two brief encounters with him at the hospital.

Petitioner testified that trial counsel only visited "one time out of the whole two years before trial." He testified that he and trial counsel "got into a heated discussion" because Petitioner did not believe trial counsel was representing him well. According to Petitioner, trial counsel never reviewed discovery materials with him. Trial counsel advised Petitioner not to testify at trial because the State would bring up his prior conviction for criminally negligent homicide and Petitioner would "look like [ ] a murderer" to the jury. Petitioner testified that trial counsel did not discuss with him the "pros and cons" of testifying at trial, nor did trial counsel discuss filing a motion to exclude evidence of his prior conviction for impeachment purposes. Petitioner testified that "the only reason" he did not testify at trial was because he thought that the State would bring up his prior conviction and that he would have chosen to testify if the prior conviction had been excluded. Petitioner testified, "I wanted to testify. That's the only reason I didn't testify. I wanted to testify to give my side of the story."

Petitioner testified that on March 5, 2014, he let Ali borrow Ms. Allen's car. Ali picked up Petitioner at Ms. Allen's house and dropped him off at another girl's house. Ali picked up Petitioner at around 12:00 a.m. on March 6. Petitioner dropped off Ali and Ali's girlfriend and then picked up Ms. Allen at her apartment. Petitioner and Ms. Allen went to the Dixie Queen restaurant. On their way to the restaurant, Ali texted Petitioner that he left his gun in Ms. Allen's car. When Petitioner and Ms. Allen arrived back at Ms. Allen's apartment, Ms. Allen "bent down to get the gun and it went off and shot [Petitioner] and [they] went to the hospital." Petitioner denied that he shot himself in the foot.

Petitioner testified that he was "drunk and . . . high off Xanax" when he arrived at the hospital. Petitioner "passed out" on the way to the hospital. Petitioner did not remember speaking to police at the hospital. He testified, "the only thing I remember at the hospital is when [Officer] Bryson came in there" and told Petitioner that he "was being locked up for unlawful possession of a handgun and felony possession of a handgun."

- 6 -

Petitioner testified that trial counsel never discussed with him filing a motion to suppress his statements to police. He testified, "I can't tell you what happened at the hospital because I was intoxicated three, four times over the limit."

Petitioner also met with trial counsel's investigator. He acknowledged that he told the investigator "something totally different." He told the investigator that he was playing dice at Ridgecrest Apartments, and Ms. Allen told him "the little FAM dude had a gun in the back and she wanted to buy it for $75." Petitioner gave Ms. Allen $80 to buy the gun. Petitioner told the investigator that, after the dice game, "one of the little guys that lost . . . came up and tried to rob the dice game and [Petitioner] got shot."

Petitioner testified that trial counsel never conveyed a plea offer by the State to him. Petitioner testified that he would have accepted an 18-year offer. Petitioner recalled his *Momon* hearing, at which he acknowledged that trial counsel advised him about the "pros and cons" of testifying at trial, but Petitioner claimed that he did not understand what "pros and cons" meant.

General Hagerman testified at the post-conviction hearing. He recalled that on the day Ms. Allen was scheduled to testify, she "admitted to [the prosecutors] what [they] had suspected, that she was actually present at the time of the murder." Mr. Hagerman relayed that information to trial counsel and extended a plea offer, but Mr. Hagerman could not recall the length of the sentence offered. Mr. Hagerman testified that trial counsel took Petitioner to the back of the courtroom and that "it was taking longer than [he] wanted." When they returned, trial counsel informed him that Petitioner had rejected the offer.

Mr. Hagerman reviewed discovery with trial counsel. He could not remember if trial counsel specifically inquired about the identity of the Crime Stoppers tipster, but he noted that "[t]he supplement itself underneath the Crime Stoppers tip talk[ed] about how the detectives . . . weren't able to gain anything more than what [was] actually in the tip[.]" Mr. Hagerman testified that his prior "attempts to track down Crime Stopper stuff has always [been] met with negative results." He testified that Crime Stoppers was "a number that you can call into anonymously and leave information without any sort of trail."

The post-conviction court denied relief in a written order addressing all of Petitioner's claims. It is from that order that Petitioner appeals.

### *Analysis*

On appeal, Petitioner raises numerous claims of ineffective assistance of counsel. He contends that he is entitled to post-conviction relief because his trial counsel was ineffective for: 1) failing to request bifurcation of Petitioner's charges of first degree

premeditated murder and being a convicted felon in possession of a firearm; 2) failing to object to a jury instruction concerning Petitioner's weapon possession charge; 3) failing to pursue a pretrial *Morgan* hearing; 4) failing to retain an independent ballistics expert; 5) failing to litigate a motion to suppress Petitioner's statements to police; 6) failing to move to prohibit the use of Petitioner's nickname "Chief" at trial; 7) failing to object and request a mistrial following hearsay testimony by Ms. Allen; 8) failing to object and request a mistrial following improper comments by the prosecutor during closing arguments; 9) failing to convey a plea offer to Petitioner; 10) failing to request a mistrial upon learning that Ms. Allen had changed stories on the day of her testimony; and 11) failing to file a motion seeking the identity of a Crime Stoppers tipster. Petitioner also asserts that the cumulative effect of trial counsel's deficiencies entitles him to post-conviction relief. Finally, Petitioner asserts that the post-conviction court erred in denying his request for funding for a ballistics expert to testify at the evidentiary hearing.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

In order to prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." *Id*. at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id*. at 370 (quoting *Strickland*, 466 U.S. at 694).

A post-conviction petitioner has the burden of proving the factual allegations in his or her petition by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009); *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013) (citing *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)). This Court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (citing *Felts*, 354 S.W.3d at 276; *Calvert*, 342 S.W.3d at 485). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Calvert*, 342 S.W.3d at 485 (citing *Grindstaff*, 297 S.W.3d at 216; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." *Whitehead*, 402 S.W.3d at 621 (citing *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." *Id.* (citing *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999)).

*Bifurcation*

Petitioner first argues that trial counsel was ineffective for failing to move to bifurcate his charge of being a felon in possession of a firearm. The State responds that trial counsel's performance was not deficient and that Petitioner was not prejudiced.

Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence" or an "attempt to commit a felony crime of violence." Had trial counsel requested bifurcation before the trial, the trial court could have concluded that a bifurcated proceeding was necessary "in order to avoid undue prejudice" and ordered bifurcation. *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009).

This Court has held that bifurcation is "the better procedure" when "the defendant is charged with offenses involving the use of violence and force and also charged with the

status offense of unlawful possession of a firearm for having a similar prior felony conviction. . . ." *State v. Foust*, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015). Nevertheless, this Court has repeatedly recognized that bifurcation is not mandated. *State v. Brian Howard*, No. W2020-00207-CCA-R3-CD, 2021 WL 144235, at *3 (Tenn. Crim. App. Jan. 15, 2021), *perm. app. denied* (Tenn. May 14, 2021); *State v. Brandon Johnson*, No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *14 (Tenn. Crim. App. Nov. 14, 2019), *perm. app. denied* (Tenn. Apr. 1, 2020); *State v. Stephan Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *16 (Tenn. Crim. App. Feb. 9, 2018), *no perm. app. filed*.

In *Foust*, the defendant argued that the trial court had not allowed him to offer the stipulation that he had been convicted of prior felonies without disclosing that the felony was for a violent offense. 482 S.W.3d at 46-47. Here, the parties entered into a stipulation at trial. "[S]tipulating to prior felonies and requesting bifurcated proceedings are both valid avenues for a defendant charged with possession of a firearm as a convicted felon." *Brandon Johnson*, 2019 WL 6045569, at *14 (citing *State v. Carlos Smith*, No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013), *perm. app. denied* (Tenn. Jan. 15, 2014)); *see Stephan Richardson*, 2018 WL 821775, at *16.

At a pretrial hearing, trial counsel asked that the indictment for the felon in possession charge be altered to read "qualifying felony" rather than criminally negligent homicide as Petitioner's prior conviction. The parties stipulated that Petitioner had previously been "convicted of a felony offense so that he qualifies as a [c]onvicted [f]elon for purposes of Count 2 of the indictment." Trial counsel acknowledged at the post-conviction hearing that he did not seek to bifurcate the charges prior to trial. He testified, "I just don't remember that being one of the core issues I was looking at." Trial counsel testified that he attempted to minimize the impact of the prior conviction by stipulating that Petitioner had a prior "qualifying" conviction. The post-conviction court found that trial counsel "did successfully exclude the mention of the Petitioner's prior negligent homicide conviction." The court concluded that trial counsel made "a strategic decision based [o]n the information available to [t]rial [c]ounsel at that time."

We conclude that trial counsel was not ineffective for failing to move to bifurcate the charges. Furthermore, we agree with the State that Petitioner was not prejudiced by counsel's failure to request bifurcation. Despite Petitioner's assertions that "the State's proof against Petitioner was flimsy" and that the State's witnesses were "incredibly unreliable[,]" the weight of the evidence against Petitioner was compelling. Ms. Allen testified that Petitioner shot the victim out of anger for his part in an unproductive robbery. *Calvin Banks*, 2017 WL 3535017, at *3. Petitioner also confessed to Mr. Farmer that he shot the victim out of anger over the robbery, telling Mr. Farmer details about the incident, including the street where the shooting occurred, the names of the other individuals present

at the time of the shooting, that Petitioner subsequently shot himself in the foot, and that the police recovered the gun at the hospital. *Id*. at *2. Bullet fragments recovered from the victim's body and a spent bullet found at the crime scene were fired from the gun found by police in Ms. Allen's vehicle, which Petitioner called his "baby" in a jail telephone call to Ms. Allen. *Id*. at *1-3.

Additionally, the trial court provided a limiting instruction to the jury that prohibited the jury from considering Petitioner's prior conviction as proof of his disposition to commit the murder. Petitioner has failed to establish that trial counsel was ineffective or that the outcome of his trial would have been different had his felon in possession charge been bifurcated. He is not entitled to relief on this issue.

*Jury Instructions*

Next, Petitioner contends that his trial counsel was ineffective for failing to object to the trial court's instruction to the jury that the prior "qualifying felony . . . involved the use or attempted use of a deadly weapon." The State asserts that Petitioner has failed to establish prejudice based on the strength of the State's case against him.

The trial court instructed the jury that, in order to convict Petitioner of being a felon in possession of a firearm, the State had to prove that Petitioner "had been convicted of a qualifying felony" and that "the felony involved the use or attempted use of a deadly weapon." Trial counsel acknowledged at the post-conviction hearing that he probably should have objected to the instruction.

Petitioner cites *State v. Charles Bernard Griffin*, No. E2019-00969-CCA-R3-CD, 2020 WL 3396675 (Tenn. Crim. App. June 19, 2020), *perm. app. denied* (Tenn. Nov. 16, 2020). In that case, a panel of this Court affirmed the trial court's denial of the defendant's request to bifurcate his charge of felon in possession of a firearm. *Id*. at *9. The panel observed that a stipulation entered into by the parties "did not describe the prior felony convictions as involving force, violence, or a deadly weapon, and the language of the trial court's jury instructions on the firearm charge were consistent with the language of the stipulation." *Id*. Petitioner attempts to distinguish *Charles Bernard Griffin* and argues that he was prejudiced by the jury instruction in this case because it implied that his prior felony involved the use of a deadly weapon.

Although the jury instruction in *Charles Bernard Griffin* did not contain such an implication, we conclude that Petitioner has failed to establish that he was prejudiced by trial counsel's failure to object to the instruction. In *Rachris R. Thomas v. State*, No. W2017-00912-CCA-R3-PC, 2018 WL 3387473 (Tenn. Crim. App. July 11, 2018), *perm. app. denied* (Tenn. Nov. 16, 2018), the petitioner claimed that his trial counsel was

- 11 -

ineffective for failing to object to the preliminary jury instruction that identified his prior felony conviction as aggravated robbery, the same offense as the offense for which he was charged. *Id*. at *4. The panel concluded that, despite the petitioner's waiver of the issue, the petitioner was not prejudiced by his trial counsel's failure to object to the instruction based on the strength of the State's case against him. *Id*. at *6. As discussed above, the evidence supporting Petitioner's murder conviction was compelling. We conclude that Petitioner has failed to establish prejudice. He is not entitled to relief on this issue.

*Request for Pre-Trial Morgan Hearing*

Petitioner asserts that his trial counsel was ineffective for failing to request a hearing to determine whether evidence of his prior conviction for criminally negligent homicide was admissible for impeachment purposes. *See State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976); *see also* Tenn. R. Evid. 609. The State responds that trial counsel's performance was not deficient because he made a reasonably based "judgment call" not to pursue a hearing.

Tennessee Rule of Evidence 609 provides, in pertinent part, that before a defendant may be impeached with evidence of a prior conviction, "the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609.

Petitioner did not testify at trial. The transcript from Petitioner's trial reveals that the trial court conducted a voir dire colloquy in which Petitioner affirmatively waived the right to testify in his own defense at the guilt phase of the trial. The record also reveals that trial counsel did, in fact, file a pre-trial motion for a *Morgan* hearing to determine which of Petitioner's prior convictions, including his conviction for criminally negligent homicide, were admissible under Rule 609 for impeachment purposes if Petitioner chose to testify at trial. A hearing on the motion was never had. Trial counsel testified at the post-conviction hearing that he believed that Petitioner's criminally negligent homicide conviction would have been admitted if Petitioner testified, and he made a "judgment call" not to pursue a hearing. In its order denying relief, the post-conviction court found that trial counsel was not deficient for failing to pursue the hearing.

The post-conviction court did not make a finding as to the admissibility of the prior conviction under Rule 609. Regardless of the admissibility of the conviction for impeachment purposes, the conviction could also have been admitted if Petitioner testified at trial and opened the door to the conviction. *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996)). Trial counsel testified that Petitioner never gave him "one straight story" about what happened on the night of the murder. Trial counsel could reasonably have concluded that, if Petitioner testified at trial, his testimony could have

- 12 -

rendered his prior conviction admissible. Trial counsel testified that he would have advised Petitioner not to testify, "not knowing what would come out of his mouth," even if the trial court had ruled that the prior conviction was inadmissible in a *Morgan* hearing. He testified that Petitioner's prior conviction was "the least of [his] concerns" regarding Petitioner's decision whether to testify at trial.

We conclude that Petitioner has not established either that trial counsel's decision not to pursue the motion was deficient or that Petitioner was prejudiced by counsel's alleged deficiency. Petitioner insists that he would have testified at trial but for trial counsel's advice that the jury would hear evidence of his prior conviction for criminally negligent homicide. If he had testified at trial, Petitioner's testimony would have been that the gun found in Ms. Allen's car was Ali's gun and that Ms. Allen accidentally shot him with that gun. In addition to trial counsel's assessment that Petitioner would not have made a credible witness, the evidence at trial that contradicted Petitioner's story was overwhelming. Petitioner has failed to establish that trial counsel was ineffective or that the outcome of his trial would have been different had he testified. He is not entitled to relief on this issue.

*Ballistics Expert*

Petitioner contends that trial counsel was ineffective for failing to retain an independent ballistics expert to rebut the State's ballistics expert witness. Petitioner acknowledges that he failed to establish how he was prejudiced by trial counsel's decision not to retain an expert by not presenting the testimony of an expert at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to . . . present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.").

In a separate issue, Petitioner contends that the post-conviction court erred by denying his request for funding for a ballistics expert to testify at the evidentiary hearing. On September 30, 2019, the first day of the post-conviction hearing, Petitioner filed a motion seeking funding for a ballistics expert, which the post-conviction court denied. Petitioner acknowledges that Tennessee Supreme Court Rule 13, section 5(a)(2) prohibits such funding and argues that the rule "violates his federal and state constitutional rights to due process." Petitioner's challenge, however, is without merit as Rule 13 clearly provides that "[i]n non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved." Tenn. R. Sup. Ct. 13 § 5(a)(2); *see Davis v. State*, 912 S.W.2d 689, 695-97 (Tenn. 1995); *Johnny Rutherford v. State*, No. E1999-00932-CCA-R3-PC, 2000 WL 246411, at *18 (Tenn. Crim. App. Mar. 6, 2000), *perm. app. denied* (Tenn. Sept. 18, 2000) (quoting *Davis*, 912 S.W.2d at 696-97) ("Neither

due process nor equal protection requires the state 'to provide expert services to indigent non-capital post-conviction petitioners.'").

Petitioner contends that "[w]hen a petitioner is denied the funding he needs to get necessary experts subpoenaed to the courtroom and simultaneously is required to present these experts, he is denied the opportunity to be heard in a meaningful manner." *See Stokes v. State*, 146 S.W.3d 56, 61 (Tenn. 2004) ("All that due process requires in the post-conviction setting is that the defendant have 'the *opportunity* to be heard at a meaningful time and in a meaningful manner.'") (quoting *House v. State*, 911 S.W.2d 705, 711 (Tenn. 1995) (emphasis in original)). While we can appreciate Petitioner's argument, we are bound by the decisions of the Tennessee Supreme Court, and we must conclude that he was not entitled to funds for a ballistics expert and is not entitled to relief.

*Motion to Suppress*

Petitioner asserts that trial counsel was ineffective for failing to litigate a motion to suppress his statements to police at the hospital, his jail telephone calls, and the gun found in Ms. Allen's car. He argues that trial counsel should have sought suppression of the evidence on the grounds that he was not provided *Miranda* warnings before his hospital statements; that his statements at the hospital were not voluntarily made because he was intoxicated and in extreme pain; and that his telephone calls and the gun were both "fruit of the poisonous tree." The State argues that trial counsel's decision not to file a motion to suppress was strategic and counsel was not ineffective because a motion to suppress on those grounds would not have been granted. We agree with the State.

"In order to succeed in proving ineffective assistance of counsel with respect to counsel's failure to file a motion to suppress the evidence, [a petitioner] must satisfy both prongs of the *Strickland* test, showing that counsel's failure to file the motion was deficient and that the deficient performance prejudiced the defense." *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 687). In order to establish the prejudice prong of *Strickland*, Petitioner must show that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Charles Bradford Stewart v. State*, No. M2015-02449-CCA-R3-PC, 2017 WL 2645651, at *14 (Tenn. Crim. App. June 20, 2017), *perm. app. denied* (Tenn. Oct. 4, 2017); *see Timothy Richard Singleton v. State*, No. W2015-02319-CCA-R3-PC, 2016 WL 6069231, at *9 (Tenn. Crim. App. Oct. 17, 2016), *perm. app. denied* (Tenn. Jan. 19, 2017). "In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. at Nashville, Sept. 12, 2011), *no perm. app. filed*.

Petitioner has failed to establish a ground upon which a suppression motion would have been granted or that there was a reasonable probability that had a suppression motion been pursued, the outcome of his case would have been different. The post-conviction court found that "Petitioner's *Miranda* rights were not violated by police questioning" because "[p]olice at the hospital were not questioning the Petitioner as a suspect in a murder investigation, but as the victim of a gunshot wound." The court also found that "[t]he information the Petitioner would have provided was freely and voluntarily given." Trial counsel testified that he did not argue a *Miranda* violation because he "could never really get the real story from [Petitioner]" and that, at the time police talked to Petitioner at the hospital, the murder had not yet been reported, and Petitioner was not a suspect. Therefore, counsel believed, no *Miranda* violation had occurred.

Petitioner has not established that he was in custody when the police questioned him at the hospital. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* warnings are only required when a suspect is (1) in custody and (2) subject to questioning or its functional equivalent. *State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001). Petitioner failed to establish that he was in any way restrained or deprived of his freedom of movement when Officer Bryson questioned him at the hospital. Moreover, Petitioner was not questioned as a suspect. Rather, Officer Bryson initiated contact with Petitioner after responding to a routine "shooting call" from the hospital. Even after Officer Bryson realized that Petitioner's and Ms. Allen's stories did not match, he did not become suspicious that Petitioner had committed a crime, but rather believed that Petitioner had accidentally shot himself.

Likewise, Petitioner has not established that his statements to police were involuntarily given. "Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible." *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). Petitioner's treating physician, Dr. McMillan, testified that Petitioner "[understood his] questions" and gave "coherent response[s]." He described Petitioner as "awake" and "alert." Petitioner's blood alcohol content was 0.133, higher than the 0.8 legal limit, but much lower than the "three [to] four times over the limit" that Petitioner testified he was intoxicated. Petitioner was not so intoxicated or impaired that his statement could not be considered the product of a free mind and rational intellect. *See State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *see State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985) ("[I]ntoxication or mental unsoundness is not alone sufficient to bar the introduction of statements made by an accused if the evidence also shows the accused was capable of understanding his rights."); *see State v. Lowe*, 584 S.W.2d 239, 241 (Tenn. Crim. App. 1979) (the blood alcohol content of the accused is merely a factor for the trial

court to consider in determining whether a confession was the product of a free mind and a rational intellect.).

Finally, Petitioner has failed to establish that the gun found in Ms. Allen's car or his jail phone calls were subject to suppression as "fruit of the poisonous tree." Petitioner argues that trial counsel should have sought to suppress the jail phone calls, in which Petitioner made incriminating statements regarding the gun found in the trunk of Ms. Allen's vehicle, on the basis that the calls were "the 'fruit' of the illegal[ly] obtained statements at the hospital." However, Petitioner offers no legal authority in support of his argument, nor does he present any analysis of how his jail phone calls fit into the doctrine of "fruit of the poisonous tree." *See* Tenn. Ct. Crim. App. R 10(b) ("Issues which are not supported by argument [or] citation to authorities . . . will be treated as waived" on appeal.); Tenn. R. App. P. 27(a)(7) (requiring a brief to contain argument and citation to authorities). Moreover, we have already concluded that Petitioner has not established by clear and convincing evidence that his hospital statements were obtained in violation of *Miranda* or made involuntarily. Lastly, Petitioner's argument that trial counsel should have sought to suppress the gun found in the trunk of Ms. Allen's vehicle as "fruit of the poisonous tree," also fails. Petitioner's hospital statements were voluntarily made and not the product of a violation of his Fifth Amendment rights. *See Walton*, 41 S.W.3d at 92.

We agree with the post-conviction court's conclusion that trial counsel's decision to forego a suppression motion was a tactical, strategic decision. On appeal, this Court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." *See State v. Hellard*, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Petitioner is not entitled to relief on this issue.

*Petitioner's Nickname*

Petitioner asserts that trial counsel was ineffective for failing to move to prohibit the use of his nickname "Chief" at trial. The State responds that Petitioner has failed to establish that trial counsel was ineffective or that Petitioner was prejudiced. We agree with the State.

This Court has previously stated that "[n]icknames should generally be avoided" during a trial and that "trial judge should closely monitor any misuse." *State v. Zirkle*, 910 S.W.2d 874, 886 (Tenn. Crim. App. 1995). Trial counsel testified that he did not even contemplate filing a motion to prohibit the use of Petitioner's nickname at trial and that he did not feel that the nickname "Chief" implied that Petitioner was engaged in criminal

activity. The post-conviction court found that the nickname was "not used in a derogatory manner; rather, it was used to identify" Petitioner.

Petitioner has failed to show how preventing the use of his nickname would have affected the outcome of his trial. We agree with the post-conviction court's conclusion that the nickname was relevant to establish Petitioner's identity in the recorded jail phone calls. At trial, the State introduced portions of three telephone calls from the jail wherein the caller identified himself as "Chief." During Ms. Allen's testimony, the State asked whether "Chief" was Petitioner, and Ms. Allen confirmed that he was. The State then referred to Petitioner as "Chief" throughout Ms. Allen's testimony and several times during its opening statement and closing argument to the jury.

Petitioner's nickname was relevant to establish his identity. Also, in our examination of the record, we do not believe that the use of Petitioner's nickname "saturated" the trial to the extent that the record affirmatively shows that it affected the jury's verdict. *See State v. Joey Dewayne Thompson*, No. E2003-00569-CCA-R3-CD, 2004 WL 1592817, at *10 (Tenn. Crim. App. July 16, 2004), *no perm. app. filed* (holding that, while improper, the prosecutor's multiple use of the defendant's nickname "Joe Thug" during its questioning of several witnesses was harmless error because the defendant failed to show that the error "affirmatively affected the result of the trial"). While the prosecutor here did use Petitioner's nickname several times, the prosecutor did not "misuse[ ]" the nickname. *See Zirkle*, 910 S.W.2d at 886.

Petitioner has failed to establish that trial counsel was ineffective for not seeking to prohibit the use of Petitioner's nickname during trial or that Petitioner was prejudiced by the use of his nickname at trial. Petitioner is not entitled to relief on this issue.

*Ms. Allen's Trial Testimony*

Petitioner asserts that his trial counsel was ineffective for failing to object and request a mistrial following Ms. Allen's testimony. Ms. Allen testified that she lied for two years about what happened on the night of the murder because she was protecting herself and her child from "[s]omething happening to [them] for telling because it already been stated that [her] house supposed to been got shot up and something was going to happen to [her] if [she] come testify." Petitioner argues that Ms. Allen's testimony about threats made to her constituted inadmissible hearsay and that its probative value was substantially outweighed by the danger of unfair prejudice. The State responds that Petitioner has failed to establish by clear and convincing evidence that the trial court would have sustained an objection to the testimony on the grounds of hearsay and that the testimony was more probative than prejudicial. We conclude that Petitioner has not shown

- 17 -

a reasonable probability that a challenge to the testimony would have resulted in a different outcome.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. Tennessee Rule of Evidence 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The State argues that Ms. Allen's testimony regarding threats made against her was not offered for the truth of the matter asserted, but rather to show why she had been lying to police about the incident – because she had been too afraid to tell the truth. Trial counsel acknowledged that he "should have objected" to Ms. Allen's testimony. However, even if Ms. Allen's testimony amounted to hearsay, trial counsel was able to effectively cross-examine her regarding the many inconsistent accounts she had given. Moreover, as discussed previously, Petitioner is unable to show that he was prejudiced by the testimony in light of the overwhelming evidence of his guilt. Prior to the testimony about which Petitioner complains, Ms. Allen had already testified that she was afraid of Petitioner and that she had lied to police to protect herself and her child.

We agree with the post-conviction court's conclusion that trial counsel's decision not to request a mistrial was a strategic decision. A mistrial is appropriate "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Jones*, 568 S.W.3d 101, 126 (Tenn. 2019) (quoting *State v. Reid*, 164 S.W.3d 286, 341-42 (Tenn. 2005)). A mistrial will normally be declared only upon a showing of manifest necessity. *Id.* Accordingly, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. *Id.* Determining whether to request a mistrial is a strategic decision, and considerable deference is given to trial counsel when analyzing the effectiveness of counsel's assistance regarding trial strategies. *See Wiley v. State*, 183 S.W.3d 317, 331-32 (Tenn. 2006); *see also Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003).

Trial counsel testified that he did not request a mistrial following Ms. Allen's testimony because he believed "the trial had gone probably as well as it could have gone" and that he did not want to provide the State with "an opportunity to start over and clean up a lot of the horrible witness testimony." The post-conviction court properly deferred to trial counsel's strategic decision not to request a mistrial. Petitioner is not entitled to relief on this issue.

*Failure to Object to State's Closing Argument*

Petitioner asserts that his trial counsel was ineffective for failing to object and request a mistrial following several improper comments by the prosecutor during closing argument. The State responds that trial counsel's decision not to object or request a mistrial was strategic and that Petitioner has not established that he was prejudiced by counsel's failure to do so.

Petitioner specifically complains about the following comments by the prosecutor during closing argument:

There were a couple of extraordinary things in this trial because I can tell you most homicide cases and most homicides, you don't have this [referring to the gun]. These are thrown in rivers or lakes or woods, just disappear in the neighborhoods. It is incredibly rare that you actually have a murder weapon.

. . . .

But what [Ms. Allen] did took some courage. Some courage. You may or may not want your daughter or your wife or whatever, girlfriend – but what she did yesterday took some courage and when she walked out, I was proud of her, I was proud of her.

. . . .

Now this is very interesting to me. Mr. Hagerman started his closing with a smoking gun. And [trial counsel] started his closing with smoke screens. And what is a smoke screen. I use the term to say it's something so you won't see the important facts, the important evidence clearly.

. . . .

[A]nd much of the cross examination of Mr. Farmer dealt with stealing and Walmart. That's a smoke screen. What difference does that make?

Petitioner contends that the prosecutor's argument was improper and trial counsel should have objected because the prosecutor: referred to facts outside the record by telling the jury that, in most homicide cases, the murder weapon is not located; vouched for Ms. Allen's credibility; referred to Petitioner's defense as a "smoke screen."

Trial counsel's decisions of whether to object to the arguments of opposing counsel "'are often primarily tactical decisions.'" *Lemar Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012) (quoting *Derek T.*

*Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), *perm. app. denied* (Tenn. May 11, 2010)), *perm. app. denied* (Tenn. May 16, 2012). Trial counsel could refrain from objecting for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. *Derek T. Payne*, 2010 WL 161493, at *15. As a result, "testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." *Lemar Brooks*, 2012 WL 112554, at *14. Absent testimony from trial counsel or any other evidence indicating that trial counsel's decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007), *perm. app. denied* (Tenn. May 14, 2007).

Trial counsel testified at the post-conviction hearing that he decided against objecting to these arguments because he believed that objecting to them could have had a negative impact on his client's case by drawing attention to the matter and "piss[ing] the jury off." Trial counsel also testified that he did not believe the arguments would affect the outcome of the trial. Petitioner did not present any evidence at the post-conviction hearing to indicate that trial counsel's failure to object to the prosecutor's statements was anything but a tactical decision.

The post-conviction court found that trial counsel made a reasonably based strategic decision not to object or request a mistrial. Even if trial counsel was deficient in failing to object to the prosecutor's statements, the deficiency did not result in prejudice. The trial court instructed the jury that the statements of counsel were not evidence and to disregard statements that were not supported by the evidence. In his closing argument, trial counsel directly responded to the prosecutor's comment that he was "proud" of Ms. Allen by emphasizing that Ms. Allen had been untruthful and stating, "[Ms.] Allen is the truth teller all of a sudden and you're supposed to be proud of her, for her courage? To come in here and lie to you?"

Petitioner has failed to show that trial counsel's failure to object during closing argument was not a strategic decision or that the outcome of his trial would have been different had counsel objected. Petitioner is not entitled to relief on this issue.

*Failure to Convey Plea Offer*

Petitioner asserts that his trial counsel was ineffective for failing to convey the State's plea offer. The State responds that the post-conviction court expressly accredited trial counsel's and Mr. Hagerman's testimonies that counsel conveyed the plea offer to Petitioner.

Trial counsel testified at the post-conviction hearing that, before Ms. Allen testified, the State extended a plea offer with an 18-year sentence. Trial counsel recalled that the trial judge "gave [him] several hours to discuss [the plea offer] with [Petitioner,]" but trial counsel was unsuccessful in his attempt to convince Petitioner to accept the offer. Mr. Hagerman also recalled that he extended a plea offer prior to Ms. Allen testifying and that trial counsel talked to Petitioner in the back of the courtroom.

Although Petitioner testified that trial counsel never relayed a plea offer to him and that he would have accepted an 18-year offer, the post-conviction court discredited his testimony and accredited trial counsel's testimony. We must defer to the post-conviction court's credibility determinations. *Whitehead*, 402 S.W.3d at 621; *Momon*, 18 S.W.3d 152 at 156. Petitioner is, therefore, not entitled to relief on this issue.

### *Failure to Request a Mistrial*

Petitioner asserts that his trial counsel was ineffective for failing to request a mistrial upon learning that Ms. Allen had changed her story on the day of her testimony. The State responds that the post-conviction court properly concluded that trial counsel's decision not to request a mistrial was strategic and that Petitioner has not established that he was prejudiced. We agree with the State.

The post-conviction court found that trial counsel's decision to attack Ms. Allen's credibility rather than call for a mistrial was "a strategic decision based [o]n the information available to [t]rial [c]ounsel at that time." The court concluded that Petitioner failed to establish that trial counsel's decision fell below an objective standard of reasonableness.

For the reasons previously stated in our discussion regarding trial counsel's failure to object to Ms. Allen's alleged hearsay testimony, Petitioner is not entitled to relief on this issue.

### *Identity of Crime Stoppers Tipster*

Petitioner asserts that his trial counsel was ineffective for failing to file a motion seeking the identity of the Crime Stoppers tipster who was mentioned in a supplemental police report. He asserts that counsel should have sought the tipster's identity in order to investigate who was chasing the victim on the day before his death and that counsel could have used the information to develop a defense theory that the victim was killed by the person who was chasing him. The State argues that Petitioner is not entitled to relief because he has not presented any evidence that a motion would have led to the disclosure of the tipster's identity or to any viable defense theory. We agree with the State.

- 21 -

Trial counsel reviewed the supplemental police report[2] prior to trial, and he discussed obtaining the identity of the Crime Stoppers tipster with Mr. Hagerman. Trial counsel testified that police informed him that they were unable to obtain the identity of the tipster. Mr. Hagerman testified that he had not been successful in prior attempts to obtain tipsters' identities.

Petitioner cites *State v. Ostein*, 293 S.W.3d 519 (Tenn. 2009), in which our supreme court set forth criteria for disclosing the identity of a confidential informant. Petitioner asserts in his brief that he "presented sufficient proof establishing that testimony from the confidential informant would have been relevant to Petitioner's defense at trial." At issue here is not the identity of a confidential police informant, but rather an anonymous tipster. There is no evidence that the police or prosecution were aware of the Crime Stoppers tipster's identity and could have disclosed it even if the *Ostein* criteria could be met. As the Tennessee Supreme Court noted in *Ostein*, disclosure of an informant's identity is usually denied when the informant was "a mere tipster," as opposed to an active participant in the crime. 293 S.W.3d at 528.

Petitioner has not shown that a motion to obtain the identity of the tipster would have been successful or that obtaining the identity of the tipster would have been favorable to the outcome of his case. We agree with the post-conviction court that Petitioner has failed to prove both deficiency and prejudice. Petitioner is not entitled to relief on this issue.

*Cumulative Error*

Petitioner argues that the foregoing alleged errors and omissions of counsel constituted cumulative error. The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'"). Here, Petitioner failed to establish a single instance of deficient performance. Thus, no cumulative effect of counsel's alleged errors

---

[2] The supplemental report states that a Crime Stopper's tip "listed a male black by the alias of 'Bam' as the suspect" and that the "[victim] was seen the day before being killed running through Hyde Park chased by a white [I]nfinit[i]." The tipster also stated that "'Bam' drives a white Infinit[i]." The report states that Memphis Police Officer Clarence Mabon "drove the area of the incident in an attempt to locate possible witnesses" and "left flyers at two locations nearby[,], but that he was unable to locate the suspect or connect anyone named "Bam" to a white Infinity.

exists.  *See James Allen Gooch v. State*, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015), *no perm. app. filed* (stating that "a petitioner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient.").

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE